UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
TYRONE ROLLE,

                Petitioner,             **MEMORANDUM & ORDER**
                                          05-CV-591 (NGG)

     - against -

CALVIN WEST, SUPERINTENDENT
Elmira Correctional Facility,

                Respondent.
------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

     Pro se petitioner Tyrone Rolle ("Rolle") brings this petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. He is currently incarcerated in Elmira Correctional Facility,

located in Elmira, New York. Rolle challenges his convictions in New York Supreme Court,

Queens County for five counts of Robbery in the First Degree (Penal Law § 160.15[4]),

Attempted Robbery in the First Degree (Penal Law § 110/160.15[4]), Rape in the First Degree

(Penal Law § 130.35[1]), Kidnapping in the Second Degree (Penal Law § 135.20), three counts

of Sexual Abuse in the First Degree (Penal Law § 130.65[1]), and Criminal Possession of a

Weapon in the Second Degree (Penal Law § 265.03).

     Prior to Rolle's trial, the prosecutor dismissed one count of Attempted Robbery in the

First Degree, one count of Kidnapping in the Second Degree, and One count of Sodomy in the

First Degree. (Minutes of January 7, 1999 at 44). At the conclusion of the People's case, the

prosecutor also dismissed one count of Kidnapping in the Second Degree (Trial Tr. at 1625-26).

The initial Indictment also charged Rolle with two counts of Robbery in the First Degree, two

counts of Rape in the First Degree, two counts of Kidnapping the Second Degree, two counts of

Sexual Abuse in the First Degree, one count of Attempted Rape in the First Degree and one

Count of Sodomy in the First Degree; he was acquitted of these counts at trial. (Id. at 1971-

1975.)

In support of his Petition, Rolle contends that: 1) the trial court improperly admitted

lineup evidence at trial; 2) his due process rights were violated because he was not present at

material stages of his trial; 3) the trial court improperly denied his requests for extra peremptory

challenges and for additional time to interview prospective jurors; 4) the trial court improperly

limited his cross examination of a witness; 5) his counsel was ineffective; and 6) the verdict was

against the weight of the evidence. For the reasons set forth below, his petition is DENIED.

## I.     Facts and Procedural History

### A.     The Indictment

The Indictment charged Rolle and an accomplice, Glen Jenkins,[1] with a June 15, 1996 to

July 15, 1996 crime spree that included kidnaping, rape, robbery, sexual abuse, and sexual

assault. Rolle was arrested on July 15, 1996 and charged with numerous counts related to this

series of attacks in southeastern Queens. (Queens County Indictment Number 2983/96.)

### B.     Pre-trial Proceedings

#### 1.     Rolle's Arrest

Detective Rakeesh Verma, the arresting officer, Detective Susan DeStefanie, and

Detective Robert Bolson testified at a pre-trial evidence suppression hearing about the attacks

---

[1] Co-defendant Glen Jenkins was tried separately from Rolle and was convicted of three
counts of Robbery in the First Degree and one count of Attempted Robbery in the First Degree.
On November 22, 1999, the Appellate Division affirmed those convictions. People v. Jenkins
266 A.D.2d 476 (2d Dept. 1999).

and the subsequent line-up identification procedures for each victim. Rolle challenges the procedures used by the detectives and maintains that they were suggestive and should have been precluded as evidence.

Detective Verma testified that when he responded to a call shortly after 1:00 a.m. on July 15, 1996, Maxine Elliot told him that, as she was removing packages from the trunk of her car, a black male pointed a silver gun at her, forced her into an alley, and sodomized and raped her. Fingerprints taken from the trunk of the car matched Tyrone Spain, a known alias of Tyrone Rolle. Information on Rolle indicated that he was a black male, about 26 years old, 5'11" tall, and 200 pounds, which closely matched Elliot's description. (Pre-Trial Evidence Suppression Hearing of Tyrone Rolle, April 2 & 3, 1997 ("Supp. Hr.") at 3-9.)

After obtaining a photo of Rolle, Detective Verma arrived at Rolle's last known residence in Queens. Around 8:00 p.m. Detective Verma arrested Rolle as he exited his residence and recovered a pouch containing a small silver handgun, numerous latex gloves, and a stocking ski mask (which was not entered into evidence) from Rolle's person. (Id. at 9-11.)

2.    The Lineups

Following Rolle's arrest, Detective DeStefanie arranged for three victims to view an identically composed array of men — five fillers and Rolle — to afford victims of recent, similar attacks in that neighborhood an opportunity to attempt to identify their attacker. Based on a photograph of Rolle, other detectives found line-up fillers similar to Rolle in height, weight, skin color, and facial features. (Id. at 12-14.) A photograph was taken of the line-up for record-keeping. (Id. at 14.) While Rolle was permitted to choose his position for the first line-up, he was neither asked whether he wanted to switch from position four nor did he request to do so for

3

the following two line-ups. (Id. at 16, 61, 65.) Although Detective DeStefanie photographed each line-up, she neglected to enter the height and weight of the fillers on the appropriate forms. She testified, however, that recording that information is not her common practice. (Id. at 67.)

On July 15,[2] Detective DeStefanie requested Naomi Brown, Maxine Elliot and Lani Allen's presence at the lineups. Brown and Allen were picked up by detectives for transportation to the 109th Precinct. Maxine Elliot was driven by her father. None of the women had contact with each other, Rolle, or the fillers prior to or immediately after viewing the lineups. Detective DeStefanie, Lieutenant Nevins, and Assistant District Attorney Kessler were present with each of the witnesses at each line-up. Detective DeStefanie instructed each witness that they would view six black males, and that if they recognized anyone, they should tell the Detective the number and where they recognized that person from. (Id. at 16-18, 20, 21, 23-26.) In her testimony, Detective DeStefanie also described the attacks of each victim, based on prior conversations with the victims, and their identifications of Rolle at the line-ups.

- Brown identified Rolle as the man who robbed and threatened to kill her while brandishing a silver handgun, on July 12, around 11:30 p.m. Rolle was in position number four in the lineup. (Id. at 18.)

- Elliot identified Rolle as the man who robbed, sexually assaulted and raped her at gunpoint, on July 15 around one a.m. Rolle was in position four in the lineup. (Id. at 22-23.)

- Allen identified Rolle as the man who sexually assaulted her at gunpoint, on July 7 around 11:30 p.m. Rolle was in position four in the lineup. (Id. at 26-27.)

---

[2] All dates refer to the year 1996 unless otherwise indicated.

Detective Bolson conducted a fourth line-up using the same five fillers as Detective DeStefanie. Bolson picked up a fourth victim, Deidre Clark and brought her to the precinct to view the line-up. As was the case with the earlier series of lineups, Clark did not have contact with the fillers, Rolle, or any other witnesses prior to or immediately after viewing the line-up. Clark identified Rolle as one of two males who attempted to rob her at gunpoint on June 15. Rolle was in position four in the lineup. (Id. at 87-89.)

At the conclusion of the first four lineups, Rolle was given food and an opportunity to call his wife and his girlfriend. He was also advised of his rights, and he acknowledged that he understood them. (Id. at 28-31.) After agreeing to speak to the detectives, Rolle admitted that he was a drug dealer and had previously sold guns. He also stated that, among other women, he had had consensual sexual relations with Maxine Elliot. (Id. at 32-33, 62-63.)

The following day, after a meal and another opportunity to call his wife and girlfriend, the detectives conducted five additional lineups. Detective DeStefanie obtained fillers as before, and Rolle chose number six as his place in the lineup. (Id. at 34-35, 70.) Katia Cantave, Nell Brigg, Donna Williams, Theresa Pegues, and Mardan Myers came to the precinct either via police transport or by their own means. None of the women had contact with the fillers, Rolle, or any of the other witnesses prior to or immediately following their lineup. (Id. at 37-38, 40-46, 48-50.)

Cantave, Pegues, Brigg, Williams, and Myers each viewed a lineup composed of the same six men.

- Cantave identified Rolle as the man who robbed and sodomized her at gunpoint, around midnight on June 30. Because she did not fully see her attacker's face, she requested that the participants in the lineup speak. Based upon his voice, Cantave

identified Rolle as her assailant, although she was not completely certain of her identification. (Id. at 37-39, 72-73.)

- Pegues identified Rolle as the man who robbed and attempted to rape her on July 6. (Id. at 43-45.)

- Brigg identified Rolle as the man who stole her pocketbook on July 4. (Id. at 43-45.)

- Williams identified Rolle as the man who robbed and raped her on July 15. (Id. at 46-48.)

- Myers was attacked on July 7, but was unable to identify her assailant from the lineup. (Id. at 49-50.)

Also on July 16, Detective Robert Bolson used the line-up composed of the same six men as Detective DeStefanie. As before, the witnesses had no contact with each other, the fillers, or Rolle before or immediately after the lineup. (Id. at 50, 93.) Leon Hepburn identified Rolle as one of two men who robbed him at gunpoint on June 17. (Id. at 90-92.) Eric Jorgenson and Karen Lafont, both victims of similar robberies in the same neighborhood, also viewed the lineup but did not identify anyone. (Id. at 95-100.)

After this series of lineups, Rolle was again fed and allowed to call his wife and girlfriend. Rolle agreed to speak with Detective Bolson and was subsequently read his Miranda warnings. (Id. at 101-103.) After acknowledging that he understood those rights, Rolle made a statement to Detective Bolson, which was recorded in "sum and substance." Rolle described to Detective Bolson a crime committed on June 17, in which Rolle and an accomplice robbed at gun point a Nigerian man who owed them money. Rolle also described a June 15 incident in

which his accomplice approached a girl and threatened her with a gun; Rolle claimed he did so in jest. Rolle described his accomplice, but would not provide a name. (Id. at 104-109, 131, 176.)

Elizabeth Stuart was unable to attend any of the initial lineups; hence, Detective DeStefanie showed her six photographs. Stuart identified Rolle as her attacker, although she was not 100% certain. On August 14, Stuart viewed a lineup and identified Rolle as the man who threatened her with a silver handgun and dragged her into an alley before she fought him off and ran to safety. (Id. at 52-54.) At this lineup, Rolle had an attorney present, who advised him to switch from seat four to seat two. (Id. at 55-57.)

The trial court denied the motion to suppress the lineup identification evidence, the statements made by the defendant, and the physical evidence. The court found that the People's witnesses were credible, that the fingerprint evidence gave probable cause for the arrest, and that the statements were voluntary. (Decision and Order of the Hearing Court for Tyrone Rolle, June 3, 1997 ("Dec.") at 1, 7, 8, 11.) Additionally, the court found that the lineups were not suggestive since the fillers were similar to Rolle in height, weight, and age. (Id. at 8.) Moreover, once processed, Rolle was provided with counsel at his August 14 lineup. The court noted that Rolle failed to demonstrate that "anything occurred which was the result of police suggestion" and that any uncertainty on the part of the witnesses went only to the weight, and not the admissibility, of the identification testimony. (Id. at 8-11.) Finally, the court concluded that the photo array shown to Stuart was not suggestive and that the Detective presenting the photo lineup did nothing to suggest the identity of Rolle. (Id.)

## B.    The Trial

### 1.    The People's Evidence

The following summarizes the sworn trial testimony of each of the victims who testified, ordered chronologically from the first attack.

Deirdre Clark was assaulted at about 10:30 p.m. on June 15 near 227th Street and Merrick Boulevard[3] by two men, one of whom had a gun. Clark screamed as one of the men tried to take her purse, causing the men to run away. As they ran off, Rolle yelled out that if he ever caught Clark in the neighborhood again, he would kill her. (Trial Transcript of Tyrone Rolle, January 21, 25, 26, 27 1999 ("Trial Tr.") (810-815, 828)). Clark told police that one assailant was 5'10", 170 to 180 pounds, with a lisp and the second assailant as 5'10" and 160 pounds. She was within two feet of her assailants and got a clear look at their faces. (Id. at 813-815, 823-825.)

Leon Hepburn was robbed around 11:40 p.m. on June 17. As he pulled up to his house, a man with a silver gun approached him and demanded that Hepburn turn over his keys. Rolle then went through Hepburn's pockets and took his wallet. Hepburn was under a streetlight and saw the faces of both perpetrators. When they became angry that he was looking at their faces, Hepburn ran away and heard what sounded like a gunshot as he ran. (Id. at 839-48, 860, 874-76.) Hepburn described both perpetrators as black males, 20 to 30 years old. Rolle was described as 5' 5" or 5' 6" tall, with a darker complexion than his accomplice. (Id. at 862-64, 882.)

Nell Briggs was robbed about 2:00 am on July 4 as she and a friend exited a livery cab at Merrick Boulevard and 233rd Street. Rolle approached Briggs, brandished a "silver handle

---

[3] All addresses are locations in the Borough of Queens unless otherwise indicated.

thing," and demanded that she turn over her purse. Believing that Rolle had a gun, Briggs threw

her purse to her Rolle, who then walked away. Briggs described her attacker as a black male,

about 6' 1" tall, 180 to 200 pounds, with "fine hair" and a little facial hair. (Id. at 699, 702, 708,

710, 713-14, 719.)

Donna Williams was attacked around 12:45 a.m. on July 5 near 170th Street and 137th

Avenue. Just after Williams exited a livery van, Rolle pointed a silver gun at her. He demanded

her money and jewelry, then dragged her to a back yard and raped her. Williams called the

police, who took her to Long Island Jewish Hospital where a rape kit was completed. (Id. at 604-

609, 634.) DNA Analysis of semen collected from Williams's underwear indicated a match with

Rolle. Although the analysis did not test for subgroups or subtypes of alleles, the results

excluded 99.9% of all blacks. (Id. at 1552, 1568-78.)

Elizabeth Stuart was attacked just after midnight on July 7 after exiting a livery van near

the corner of Merrick Boulevard and 228th Street. Rolle put his gun in her ribs and told her to

go into a dark alley with him and take off her clothes. Rolle ran away when a car pulled up near

them and Stuart made a loud noise, said help, and ran towards the car. (Id. at 660-63, 675, 678,

685-86, 688.) Stuart called the police upon returning home and gave a formal statement the

following day. Although her description was vague, she said that her attacker was a black male,

taller than she — Stuart is 5'3" — but was unsure whether or not he had facial hair. (Id. at 685-

689.)

Lani Allen was attacked around 11:30 p.m. on July 7 after exiting a livery van on the

corner of 228th Street and Merrick Boulevard. Rolle put a gun to her head and demanded her

jewelry and money. The sidewalk where the attack occurred was lit by streetlights, making

Rolle's face visible to Allen. Rolle forced Allen to walk to a backyard with him, told her to remove her clothes, and proceeded to grope and sexually assault her. He returned a ring to her that she told him was a family heirloom and told her that she could meet him on the corner the following day to get the rest of her property back. (Id. at 1077-1086, 1100-1116.) Allen described her assailant as 5'7" to 5'8" tall, 220 pounds, with a dark brown-skinned complexion, a goatee, a big belly, and a muscular chest. (Id. at 1089, 1097-98.)

Teresa Pegues was attacked around 11:30 p.m. on July 9 near the corner of Lucas Street and Nashville Street. After ignoring Rolle, who tried to flirt with her, Pegues kept walking down Nashville Street. Rolle approached her from behind, putting his arm around her shoulder and a silver gun with a black handle to her head.[4] Rolle took Pegues to a driveway on the next block and told her that he was going to rape her. He ordered her to pull down her pants, but was interrupted by a barking dog before he could proceed any further. Rolle then told Pegues that she could leave, which she did. (Id. at 1133-37, 1158-60.) Pegues described her attacker as a stocky, brown-skinned male approximately 30 years old, wearing a do-rag, and without facial hair. Pegues said that she saw her attacker's face from only the eyebrows down.

Naomi Brown was attacked around 11:30 p.m. on July 12 near 225th Street and 138th Avenue. Rolle put a silver gun to her stomach and demanded that she turn over her possessions. Brown handed her pocketbook to Rolle, who was only six inches away from her. Rolle put the gun to Brown's head, but ran away when she dropped to her knees and called for Jesus. Brown ran to a neighbor's house and called the police. She described her attacker as a dark-skinned black male, about 150 pounds, wearing a hooded sweatshirt. (Id. at 1373-83, 1386, 1390-91,

---

[4] The handle of the gun was missing pieces. (Trial Tr. 1130)

1396.)

Maxine Elliot was attacked around 1:00 a.m. on July 15 in front of her home at 227th Street and 116th Avenue. As she was removing packages from her car, Rolle approached her with a silver gun and demanded her jewelry. Rolle took Elliot's bag, closed the trunk of her car, and dragged her into the back yard of her house. (Id. at 741-45, 753, 761-764, 768-70, 776-80, 802.) Rolle undressed Elliot and proceeded to sodomize and rape her. Afterwards, he wiped himself off with some paper towels, which he threw on the ground, before returning Elliot's jewelry and asking for her phone number. (Id. at 749-50, 789-90, 800.)

After the attack, Elliot went home and told her family. She described her assailant as a 25 year old black male but could not recall whether or not he had facial hair. Elliot was taken to the hospital, where a rape kit was completed.[5] Elliot denied that she had a relationship with Rolle prior to the attack. (Id. at 750-751, 760, 796.)

Elliot and Pegues identified Rolle in open court. (Id. at 753, 1133.) The other victims were not asked to and therefore did not identify Rolle from the witness stand. The victims testified further that there was no contact between the witnesses and Rolle, the fillers, or other witnesses prior to view each lineup.

Detectives Verma, Bolson, and DeStefanie testified at trial for the People. Their testimony closely mirrored that given in the pre-trial suppression hearing, discussed above, and their testimony supported the People's position that the lineups were not suggestive and were conducted within acceptable bounds of procedure. (Id. at 898-1075, 1172-1193, 1448-1523.)

---

[5] DNA analysis of sperm collected from the rape kit excludes 99.9% of all blacks. (R 1552-1567).

### 2. Petitioner's Evidence

Dr. Sharon Strater, an emergency resident physician at Long Island Jewish Hospital provided testimony concerning her treatment of Donna Williams. An examination of Williams at the emergency room revealed no bruises or abrasions in her pelvic area, and Williams told Strater that she had not resisted her attacker. Upon cross examination, Dr. Strater testified that it would be possible for a woman in her twenties to avoid pelvic injury if she did not resist her attacker. (Id. 1636-37, 1640-41.)

Rolle testified at trial on his own behalf and maintained his innocence on all counts. To contest the divergent physical descriptions, Rolle testified that he was 5'11", 25 years old, and had a goatee and sideburns at the time of the attacks. Rolle also noted his adulterous tendencies; he was married to Tanya Rapley, had two children with Jacqueline Dix, and had a sexual relationship with at least three other women. (Id. 1644-46.)

Rolle testified that he had had a relationship with Maxine Elliot spanning from January to July 9, 1996. During their relationship, Rolle maintained that he saw her in the evenings when she was not attending St. John's University and that they went to movies, out to dinner, and stayed in hotels. He did not know the name of Elliot's best friend, where Elliot was born, her father's name, or what her major was in college. (Id. at 1644-1647, 1667-1675.) By contrast, Elliot testified that she was a full-time student at Morgan State University in Baltimore, Maryland, that she was majoring in biology, and that she came home to visit her family every few weeks. (Id. at 1645-46, 1662-63.)

According to Rolle, Elliot was a jealous former lover rather than a rape victim and was upset when Rolle ended their affair on July 9. Rolle testified that around 11:00 p.m. on July 15,

12

Elliot asked to see Rolle, who met her around midnight at 227-16 116th Avenue and talked with her in her car. Elliot cried and they began to kiss. Elliot told Rolle that it was her fantasy to have sex outside, so they exited the car, got a blanket and paper towels from the trunk, and went into the alley where they had sex on the blanket. Rolle denied that he forced Elliot to have sex with him or that he used a gun. (Id. at 1648-50, 1669, 1675.) Additionally, Rolle denied that he committed any of the crimes attributed to him and, moreover, claimed that on July 7 he was present at Jamaica Hospital from the afternoon to the next morning for the birth of his son. (Id. at 1654, 1656, 1661, 1676-79, 1700-01.)

Rolle testified that at his arrest he had a silver gun and latex gloves in his waist pouch, but denied ever having seen the mask. According to Rolle, he intended to take the gun to his mother-in-law's house to keep away from his wife's son, who was staying in their house. (Trial Tr. 1652-53, 1664-66, 1694.) Once arrested, Rolle made a statement to Detective DeStefanie regarding Elliot. Although the statement was voluntary, Rolle testified that he was told that if he wanted to make a phone call, he should make the statement. Rolle first testified that no one had read him his rights, but then admitted that Detective DeStefanie had in fact done so. (Id. at 1657, -59, 1681-84.)

Rolle also denied that he had made statements to Detective Bolson or given him Glen Jenkin's name and description, and also denied that he knew Jenkins. Rolle testified further that Detectives Bolson and DeStefainie had given him three blank sheets of paper and three *Miranda* forms to sign and that he had not written or dictated his statements regarding Jenkins or any additional robberies. (Id. at 1657-60, 1683, 1686-89.) In contrast, Detective Bolson testified that Rolle had declined to write his statements and in fact had given the Detective permission to

13

record them in "sum and substance" before signing them. Bolson adamantly denied that he had given Rolle any blank papers to sign. (Id. at 1460-1464, 1510-1514.)

Rolle also admitted to two prior convictions for criminal possession of controlled substance. In both instances, he had used an alias derived from his father's name to deceive police. (Id. at 1645-46, 1622-23.)

### C.   Pretrial Procedural History

A joint suppression hearing concerning the line-up evidence against Rolle and Jenkins commenced on April 2, 1997 and continued on April 3 in Rolle's absence. His attorney did not object and waived Rolle's appearance. (Supp Hr. at 126-27, 167.) The hearing court heard testimony from Detectives Verma, DeStefanie, and Bolson concerning the investigation of the defendants, their arrests, the attacks themselves, and the lineups.

Neither Rolle nor his attorney were present at an April 8, 1997 hearing concerning co-defendant Jenkins. Jenkins's counsel informed Landou, Rolle's lawyer, that his presence was not necessary at the hearing. The court subsequently agreed with this determination because the testimony on April 8 concerned only the events surrounding Jenkins's arrest. (Pretrial Hearing for Tyrone Rolle and Glen Jenkins, April 8 and 14, 1997 ("Pre Tr. Hr.") at 188)).[6] The hearing continued on April 14, at which point Landou was present but Rolle was not. (Id. at 242.) At the

---

[6] The transcript of the hearing indicates that the court was informed of the reason for Rolle's and his attorney's absence and that his attorney had been informed of the nature of the hearing: "Mr. Mulvaney: This portion of the hearing only pertains to the defendant Jenkins and I would say that the scope of the hearing from this point on is entirely contained within the Payton concept about where the arrest of the defendant took place. And for that reason, I told Mr. Landou that I didn't think it was necessary for him to be here. That we would just be presenting with the defendant Jenkins at this time."
"The Court: Correct." (Pre Tr. Hr. at 188.)

hearing, Detective Bolson, Parole Officer Debra Leihman, and co-defendant Jenkins testified. The only testimony pertaining to Rolle was from Detective Bolson, who testified that Rolle gave him Jenkins's name and that Jenkins's arrest was made based on this information. The remainder of the testimony related only to Jenkins's arrest. (Id. at 241-277.)

### D. Post-trial Procedural History

Rolle was convicted of five counts of Robbery in the First Degree, Attempted Robbery in the First Degree, Rape in the First Degree, Kidnapping in the Second Degree, three counts of Sexual Abuse in the First Degree, and Criminal Possession of a Weapon in the Second Degree. He was found not guilty of two counts of Robbery in the First Degree, two counts of Rape in the First Degree, two counts of Kidnapping the Second Degree, two counts of Sexual Abuse in the First Degree, one count of Attempted Rape in the First Degree and one Count of Sodomy in the First Degree. (Trial Tr. at 1971-1975.)

Rolle was sentenced, as a persistent felony offender, to an indeterminate prison term of twenty-five years to life for each count. The sentences for four counts of first-degree robbery, attempted first degree robbery, first-degree rape, one count of attempted first-degree rape, and possession of a weapon were to run consecutively to each other and to a sentence Rolle was already serving under Queens County Indictment Number 4072/96. (Sentencing Hearing, dated March 29, 1999.)[7] The remaining terms of incarceration were to run concurrently with each other.

In May 2003, Rolle filed an appeal raising the same claims raised in his present habeas

---

[7] Rolle was convicted of Conspiracy in the Second Degree resulting from his attempts to arrange for the murder of an alleged victim in this case. (10/23/2006, Gov. Br., pg. 4.)

petition. On February 3, 2004, the Appellate Division affirmed Rolle's judgment of conviction. People v. Rolle, 771 N.Y.S. 2d 704 (App. Div. 2d Dep't. 2004). On June 25, 2004, Rolle's application for leave to appeal that decision was denied. People v. Rolle, 816 N.E. 2d 208 (N.Y. 2004). Rolle then filed a *pro se* petition for a writ of habeas corpus in this Court, which was dismissed to allow him to return to state court to exhaust his claim of ineffective assistance of appellate counsel at the State level. (July 17, 2006 Memorandum & Order in Case No. 05-CV-591 (NGG).)

Rolle subsequently moved, *pro se*, for *coram nobis* relief, arguing that his counsel was ineffective because he failed to argue that Rolle was denied the right to be present at all material stages of the trial – specifically, that challenges to prospective jurors were supposedly not made in open court. This motion was denied on July 11, 2006 by the Appellate Division. People v. Rolle, 817 N.Y.S. 2d 523 (App. Div. 2d Dep't. 2006).

## II. Discussion

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a petition for a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Price v. Vincent, 538 U.S. 634, 638-40 (2003).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a

federal claim." Sellan v. Kuhlman, 261 F.3d 303, 313 (2d Cir. 2001) (citations omitted). A state court has adjudicated a state petitioner's claim on the merits when it "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." Sellan, 261 F.3d 303 at 312. The state court's decision, however, need not "explicitly refer to either the federal claim or to relevant federal case law." Id. A decision on the merits triggers "the deference mandated under AEDPA." Id. at 310.

Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." Overton v. Newton, 295 F.3d 270, 278 (2d Cir. 2002). A State Court's determination of factual issues "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B.      Rolle's Claims**

1.      Admission of Tainted Line-Up Evidence

Because the New York State Supreme Court held a suppression hearing to assess the circumstances surrounding the line-up procedures, its decision to not suppress the evidence was

made upon the merits. Thus, AEDPA deference applies. Sellan, 261 F.3d at 310; see also James v. Walker, 99-CV-6191(JBW), 2003 WL 22952861 at 6 (E.D.N.Y. 2003) (there is a presumption of correctness attached to the trial court's factual findings after an evidentiary hearing).

Evaluating the permissibility of in-court identification testimony based on out-of-court identification procedures "requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification." United States v. Wong, 40 F.3d 1347, 1359 (2d Cir. 1994; (quoting Neil v. Biggers, 409 U.S. 188, 198 (1972)). If the procedure was not suggestive, the evidence presents no due process obstacle to admissibility, and further inquiry is unnecessary. Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001).

To determine the suggestiveness of the identification procedure, a federal court may rely upon the trial and suppression hearing record. See Carroll v. Greene, No. 04 Civ. 4342 2006 WL 2338119, 12 (S.D.N.Y. 2006) (noting that the effect of suggestive identification procedure is to be determined from the record of hearing and trial). "There is no requirement that a suspect . . . be surrounded by people identical in appearance." Tavarez v. LeFevre, 649 F. Supp. 526, 530 (S.D.N.Y. 1986); see also Roldan v. Artuz, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000) ("a reasonable effort to harmonize the [lineup or photo array] is normally all that is required."). A line-up is unduly suggestive, however "if [the defendant] meets the description of the perpetrator previously given by the witness, and the other line-up participants obviously do not." Raheem, 257 F. 3d at 134 (finding a lineup impermissibly suggestive because "one witness ha[d] emphasized a particular characteristic of the perpetrator in giving a description to the police" and

the person in the line-up was the only lineup participant with that characteristic).

Here, the lineups were not impermissibly suggestive. Each of the victims gave varying descriptions of their assailant with no emphasis on a particular characteristic of the assailant that was not shared by the other line-up participants. Additionally, the police officers, acting pursuant to Detective DeStefanie's instructions, located fillers based on a recent photograph of Rolle. The photographic evidence submitted at trial and Detective DeStefanie's testimony, both of which were considered by the pre-trial suppression hearing court, confirmed that the fillers and Rolle were satisfactorily similar in appearance. Furthermore, nothing in the record suggests collusion between the witnesses and the police or improper conduct by the police to create suggestive line-ups beyond Rolle's bare assertions of conspiracy. In fact, the witnesses had no contact with one another before the lineups. Accordingly, this court declines to disturb the state-court decision that the lineups were not suggestive.

Even if the lineups were impermissibly suggestive, they do not raise a substantial likelihood of irreparable misidentification; in other words, the identifications remain independently reliable. Raheem, 257 F.3d at 133. Trial testimony indicated that, although only two of the six victims were asked to identify Rolle in open court, all eight victims did identify Rolle after viewing the line-up, most within seconds of first seeing the lineup. Each victim also testified that at the time of the attack, there was ample opportunity to see and remember Rolle's face.

Finally, Rolle's claim that the lineup identification evidence should be suppressed because he did not have counsel at the July 15 and July 16 lineups is also without merit because the right to counsel at pretrial identification does not attach before "the initiation of adversary

19

judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 687, 692 (1972). The first two lineups were conducted shortly after Rolle's arrest and before he was formally charged in this matter, and there is no evidence in the record that Rolle requested and was denied counsel. Furthermore, at the August 14 lineup, once he was formally charged with these crimes, Rolle had counsel present. Accordingly, the court concludes that the line-ups were not impermissibly suggestive.

### 2. Denial of Additional Peremptory Challenges

Rolle contends that his right to a fair trial was violated when the court denied his application for additional peremptory challenges. While upon direct appeal "[t]he denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice," Swain v. Alabama, 380 U.S. 202, 219 (1965), peremptory challenges are a creature of statute and are not required by the Constitution, Gray v. Mississippi, 481 U.S. 648 (1987). Hence, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. Ross v. Oklahoma, 487 U.S. 81, 89 (1988).

Here, the trial court granted Rolle fifteen peremptory challenges. New York State law requires that a defendant have fifteen peremptory challenges when the highest charge is a Class B felony and twenty where the highest charge is a Class A Felony. McKinneys CPL § 270.25(2). Rolle's most serious charge was Rape in the First Degree, a Class B felony. McKinneys Penal Law §130.35. Accordingly, under New York State law, Rolle was entitled to fifteen peremptory challenges. Therefore, the trial court adhered to both Supreme Court precedent and New York statutes, thus precluding habeas relief on this ground. See United States v. Martinez-Salazar, 528

20

U.S. 304, 316 (2000).

3.    Presence at Material Stages of Trial

The Appellate Division found that Rolle waived his right to be present at a portion of the pre-trial suppression hearing where his attorney cross-examined Detective Bolson, that he had no right to be present at portions of the hearing which related only to co-defendant Jenkins, and that he was not deprived of due process rights when he was absent at side-bar conferences during voir dire. These conclusions were not contrary to or an unreasonable application of established Supreme Court precedent.

It is well-established that an important right of the accused is to be present in the courtroom at every stage of his trial. Lewis v. United States, 146 U.S. 370 (1892). However, due process is violated "to the extent that a fair and just hearing would be thwarted by [an accused's] absence and to that extent only." Snyder v. Massachusetts, 291 U.S. 97, 108 (1934). Thus, a defendant must be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charges." Id. at 105-106; see also Kentucky v. Stincer, 482 U.S. 730, 745 (1987) ("defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.")

Additionally, a defendant may waive the right to be present if the wavier is knowing and voluntary. Illinois v. Allen, 397 U.S. 337, 342-344 (1970). "[W]hen a defendant is fully apprised of the nature of the pre-screening procedure, makes no objection to the procedure, and has counsel present for the duration of the pre-screening, a knowing waiver of the right to be present occurs. Cohen v. Senkowski, 290 F.3d 485, 492 (2d Cir. 2002). Although a waiver must

21

be knowing and voluntary, "only minimal knowledge on the part of the accused is required when waiver is implied from conduct," based on "whether the trial court's actions in open court gave [the defendant] sufficient 'minimal' knowledge of the nature and purpose of the [proceeding] to conclude that he waived his right to be present when he did not attend." Id. The trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend." United States v. Gangon, 470 U.S. 522, 528 (1985) (internal citations omitted).

Rolle contends that his absence at the April 8 and 14 portions of the suppression hearing violated his due process right to be present at material stages of his trial. The hearing on those two days, however, related solely to Rolle's co-defendant Glen Jenkins. As such, those hearings were not critical to the outcome of Rolle's trial and, if present, Rolle would have been unable to contribute to the fairness of the procedure. Stincer, 482 U.S. at 745. Accordingly, Rolle suffered no due process deprivation from his April 8 and 14 absences.

Rolle also contends that his absence at the April 3 portion of the suppression hearing violated his right to be present. At the hearing, Rolle's and Jenkins's attorneys cross-examined Detective Bolson. Although Rolle was not present, his attorney specifically waived his client's appearance.[8] Furthermore, on April 17, the next time that Rolle and his attorney were both present in court together, the court confirmed that Rolle had voluntarily waived his appearance. Counsel also advised the court that he would give Rolle a copy of the transcript from that day. The Court then explained to Rolle the substance of the April 3 hearing and asked whether he

---

[8] Excerpt from the transcript: Clerk: Are you waiving your client's appearance? Mr. Landou: I assume so. Yes. Yes. (Supp. Hr.: 127.)

"consented to be part of that even though you were not present." Rolle agreed that he did

consent to his absence. (Minutes of April 17, 1997, p. 3.) Thus, the record demonstrates that

Rolle "knowingly and voluntarily" waived his right to be present at the April 3 hearing. See

Allen, 397 U.S. 342.

Finally, Rolle's further contention that he was denied his right to be present because he

was absent from in-chambers conferences where parties exercised for-cause and peremptory

challenges to jurors is without merit. See Cohen, 290 F.3d at 491 ("[The defendant] had no right

to be present during the in-chambers exercise of four rounds of juror challenges when

[Defendant] was represented by counsel and [Defendant] was given an opportunity to consult

with counsel before the sessions began, and that the challenges were later effectuated in open

court..."); see also Evans v. Artuz, 68 F. Supp. 2d 188, 195 (E.D.N.Y. 1999) (Defendant's right

to be present was not violated where he "was able to view every potential juror as he or she

answered voir dire questions in open court. He had the chance to consult with his attorney about

challenges before the attorney retired with the court to the robing room. He was present when the

court clerk excused certain jurors and seated others . . .").

### 4. Trial Court Denial of Two For-Cause Challenges to Potential Jurors and Additional Time to Interview Prospective Jurors.

The trial court's denial of two for-cause challenges and Rolle's request for additional time

to interview prospective jurors was proper and the Appellate Division's decision upholding that

decision was not contrary to or an unreasonable application of Supreme Court precedent. Every

criminal defendant has a Sixth Amendment right to trial by an impartial jury. Duncan v.

Louisiana, 391 U.S. 145, 159 (1968). The Supreme Court has expressly held, however, that an

erroneously denied challenge for cause by the defendant results in no constitutional error unless

that juror is actually seated on the jury. <u>Ross v. Oklahoma</u>, 487 U.S. 81 (1988); <u>see also</u>

<u>Cunningham v. Bennett</u>, No. 02 CV 4635, (A.R.R.), 2005 WL 1162475 (E.D.N.Y.). That

petitioner had to use peremptory challenges to strike the jurors at issue is of no consequence, for

"the loss of a peremptory challenge [does not] constitute[ ] a violation of the constitutional right[

] to an impartial jury." <u>Ross</u>, 487 U.S. at 88. "So long as the jury that sits is impartial, the fact

that the defendant had to use a peremptory challenge to achieve that result does not mean the

Sixth Amendment was violated." <u>Id</u>.; <u>see also</u> <u>United States v. Martinez-Salazar</u>, 528 U.S. 304,

307 (2000) ("[I]f the defendant elects to cure [a judge's error] by exercising a peremptory

challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been

deprived of any . . . constitutional right.").

Here, neither of the two jurors whom petitioner contends should have been subject to

for-cause challenges were seated on the jury. Instead, after the court denied Petitioner's

for-cause challenges, he challenged both of them peremptorily and neither juror actually sat on

the jury. Accordingly, Rolle is not entitled to habeas relief on these grounds.

While the Sixth Amendment guarantees that "the accused shall enjoy the right to a speedy

and public trial, by an impartial jury," the length of juror interviews during voir dire is an issue of

state law (<u>see</u> McKinney's CPL 270.15) rather than one of constitutional dimension. Moreover,

here, where the trial court allowed time for defense counsel to interview the jurors and even

compromised upwards on the time allotted, even Rolle's rights under state law were not violated.

<u>See</u> <u>People v. Davis</u>, 560 N.Y.S.2d 499, 500 (N.Y. App. Div.1990) (limiting the third round of

voir dire examination of prospective jurors . . . to ten minutes for each counsel was not abuse of

discretion nor inherently arbitrary procedure where counsel was not denied fair opportunity to

question jurors about relevant or material matters and court itself questioned jurors, eliciting information which was relevant to challenges for cause); see also People v. Jean 537 N.Y.S.2d 282, 283 (N.Y. App. Div 1989) (the trial court did not improvidently exercise its discretion in imposing a time limit of 15 minutes on each attorney's voir dire of prospective jurors in the first two rounds and 10 minutes for examination of prospective jurors in the third round.)

### 5. Limitation on Cross-Examination of Detective Bolson

Petitioner claims that the trial court impermissibly limited his cross examination of Detective Bolson and thus "stymied [his] right to discredit Bolson." (January 12, 2005 Habeas Petition No. 05CV0024). At a pre-trial conference, over defense counsel's objections, the trial court granted the State's motion to prevent defense counsel from questioning Detective Bolson about a fatal automobile accident in which he was involved while on duty. The court found that the topic was a collateral issue which went to credibility only. (Trial Tr. 29.) The Appellate Division upheld the trial court's decision on the merits. See People v. Rolle, 4 A.D.3d 542 (2d Dept. 2004).

The right of an accused to confront the witnesses against him or her through cross-examination implicates a defendant's Sixth and Fourteenth Amendment rights to a fair trial, serves as an essential safeguard of fact-finding accuracy, and is "the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). A trial court may place restrictions on a defendant's presentation of evidence without offending the Constitution, however, so long as those restrictions serve "legitimate interests in the criminal trial process . . . and are not arbitrary or disproportionate to the purposes they are designed to serve." United States v. Almonte, 956 F.2d 27, 30 (2d Cir.

1992). For example, a trial court has discretion to limit the scope of cross-examination to prevent repetitive, confusing, or irrelevant questioning. See Delaware v. Van Arsdall, 475 U.S. 673, 678-89 (1986). In sum, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original).

Finally, even if a trial court erred in limiting cross-examination, the error rises to the level of a constitutional deprivation only if it "had substantial and injurious effect or influence in determining the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 766 (1946); see also Brecht v. Abrahmson, 507 U.S. 619 637-38 (1993) (applying Kotteakos standard for habeas review of a trial error involving post-Miranda-warning silence); Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007) (in § 2254 proceedings a court must assess the prejudicial impact of the constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht whether or not the state appellate court recognized the error and reviewed it for harmlessness).

In this case, the trial court did not err in limiting the cross examination of Detective Bolson. First, the questioning involved a traffic accident that was irrelevant to the issues at trial. Although the traffic accident involved a fatality, it had occurred after Rolle's arrest, the line-ups, and the investigation. Additionally, at the time of the trial, the accident was still under investigation and had yielded no official findings of wrongdoing on the part of Detective Bolson. In fact, Detective Bolson was still on active duty and had not been suspended. He also informed the People that he would invoke his Fifth Amendment right against self-incrimination if

questioned about the accident. (Trial Tr. 21-23.) Given the collateral nature of the accident and its potential to confuse the jury, the trial court properly limited defense counsel's cross-examination. See People v. Ayers, 161 A.D. 2d 770, 771 (N.Y. App Div. 2d Dept. 1990) (the trial court properly used its discretion to limit the cross-examination of the arresting detective concerning an unrelated civil suit); see also United States v. Laster, No. S106 Cr.1064 (JFK), 2007 WL 2872678 (S.D.N.Y.) (the trial court properly used its discretion when it limited the cross-examination of the arresting detective regarding a prior, unrelated complaint with the Civilian Complaint Review Board where there were no conclusive findings of wrong-doing on the part of the Detective).

Second, defense counsel had ample opportunity for effective cross-examination of Detective Bolson. Here, the record indicates that the trial court permitted defense counsel to cross-examine detective Bolson about all matters pertinent to the line-ups, Bolson's questioning of Rolle, and all investigative activities. Accordingly, the trial court did not deviate from or misapply established Supreme Court precedent when it limited defense counsel's cross-examination of Detective Bolson. See Fensterer, 474 U.S. 15 at 21-22 ("the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to prove and expose . . . infirmities through cross-examination, thereby calling to the attention of the fact finder the reason for giving scant weight to the witness' testimony.")

Further, even if the trial court erred in limiting Detective Bolson's testimony, the error was harmless under the Kotteakos standard since the evidence other than Detective Bolson's testimony overwhelmingly established Rolle's guilt. Thus, limiting the opportunity to cross-examine Detective Bolson about the unrelated traffic accident did not have a substantial and

injurious effect on the jury's verdict. See Kotteakos, 328 U.S. at 766.

6.    Ineffective Assistance of Counsel

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added). The Supreme Court has explained that, in giving meaning to this requirement, we must be guided by its purpose - "to ensure a fair trial"- and that, therefore, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on an ineffective-assistance-of-counsel claim, a petitioner must prove both (1) that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," id. at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694; see also Wiggins v. Smith, 539 U.S. 510 (2003). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Id. at 697.

Under the first prong of Strickland, choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable

28

professional judgments support the limitations on investigation." Id. at 690–91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. The Second Circuit has suggested that all of counsel's significant trial decisions must be justified by a sound trial strategy. See Eze v. Senkowski, 321 F.3d 110, 113 (2d Cir. 2003) (remanding to district court for factual hearing because the Second Circuit was "unable to assess with confidence whether strategic considerations accounted for . . . counsel's decisions"). Yet, there remains "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

In evaluating the prejudice prong of the Strickland test, the court looks to the "cumulative effect of all of counsel's unprofessional errors in order to determine whether the prejudice reaches the constitutional threshold." Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005). Generally, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. Additionally, ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. See Eze, 321 F.3d at 112.

When, as here, the state court has rejected Petitioner's ineffective-assistance claim on the merits, a petitioner must not only satisfy the Strickland standard but also must show that the state court's rejection of his claim was either contrary to Strickland or was an unreasonable application of Strickland. See Williams v. Taylor, 529 U.S. 362, 412–13 (2000).

Rolle's claim that trial counsel was ineffective because he failed to ensure that Rolle was present at all material stages of his trial is without merit. First, as discussed above, Rolle had no

29

right to be present at either the pre-trial conferences regarding his co-defendant Glen Jenkins or the in-chambers conferences regarding potential jurors. Since Rolle had no right to be at those portions of his trial, counsel was under no obligation to ensure his presence or make arguments to that effect on his behalf. See Barnes, 463 U.S. 745 at 754 (defendant has no constitutional right to compel appointed counsel to press non-frivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points). Second, because Rolle himself waived his presence at the portion of the suppression hearing where counsel cross-examined detective Bolson, Rolle's counsel was not ineffective for also waiving Rolle's presence. (Supp. Hr. 2-3.)

Even assuming, *arguendo,* Rolle did not waive his right to be present at the suppression hearing, that error did not create sufficient prejudice under the prejudice prong of Strickland to constitute ineffective assistance of counsel. The evidence presented at the portion of the suppression hearing where Rolle was absent was insignificant when compared with the weight of the evidence as a whole in support of Rolle's guilt. See United States v. Weisser, 417 F.3d 336, 345 (2d Cir. 2006) ("The jury had before it a mountain of evidence supporting [defendant's] guilt. Any plausible error by trial counsel with regard to these few exhibits simply does not 'undermine confidence in the [verdict]'") (quoting Strickland, 466 U.S. at 694). Accordingly, Rolle cannot establish that the "cumulative weight of error . . . reached the constitutional threshold." Lindstadt v. Keane, 239 F.3d 191, 202 (2d Cir. 2001).

Although the Strickland test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. See Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992). Appellate counsel does not have a duty

to advance every non-frivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). Either a federal or a state-law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state . . . claim fell outside the wide range of professionally competent assistance." Id.

For the reasons enumerated in the analysis above, Rolle's claim that his appellate counsel was ineffective for failing to argue that the challenges during voir dire were not made in open court does not have merit. Accordingly, the state appellate court did not contravene Supreme Court precedent when it rejected Rolle's ineffective-assistance-of-appellate-counsel claim. Moreover, appellate counsel submitted a thorough, albeit ultimately unsuccessful, brief on appeal which cited to applicable law and appropriate portions of the record. Appellate counsel also filed an application for leave to appeal to the New York Court of Appeals when Rolle's conviction was affirmed, which is further evidence of counsel's adequate representation. Finally, Rolle's argument that appellate counsel's decision not to argue that challenges to prospective jurors were not made in open court is belied by the record because all challenges to prospective jurors *were* made in open court. (Trial Tr. 332-41, 421-29, 543-51). For the aforementioned reasons, this Court rejects Rolle's claims of ineffective assistance of trial and appellate counsel.

### 7. Sufficiency and Weight of the Evidence

The final point raised in Rolle's habeas petition contains two related arguments: a contention that the evidence was insufficient to prove his guilt beyond a reasonable doubt, and a

31

claim that the verdict was against the weight of the evidence, both of which were adjudicated on the merits.

While this court reads *pro se* habeas petitions liberally, a federal habeas petition "may be dismissed if it contains only vague or conclusory allegations." Blackledge v. Allison, 431 U.S. 63, 75 (1977); see also Skeete v. People of New York State, No. 03-CV-2903 (FB), 2003 WL 22709079 (E.D.N.Y.) (no viable claim for habeas relief was presented where petitioner's claim was no more than a vague allegation that "numerous" violations and errors occurred at his trial and petitioner failed to offer even a cursory description of these alleged errors). Here, this court is under no obligation to consider Rolle's claims based on the weight and insufficiency of the evidence because the claims are both vague and conclusory.[9]

In an abundance of caution, however, the court will briefly consider Rolle's claims. Rolle's sole claim that relates to the record — that there were no in-court identifications — is unsupported since two victims identified Rolle in open court and the remaining victims identified him at line-ups. As discussed above, the line-ups were reliable and therefore cannot form the basis of Rolle's weight or insufficiency of evidence claims. Moreover, because this court must defer to the jury's assessment of the weight of the evidence, "[c]hallenges to the weight of the evidence supporting a conviction are not cognizable on federal habeas review." Robinson v. Ricks, No. 00-CV-4526 (JG), 2004 WL 1638171 at 3 (E.D.N.Y. 2004).

---

[9] Rolle claims that "[b]ased upon the evidence that was inconsistent, unreliable and legally insufficient, the verdict was not supported in violation of the defendants constitutional rights to be convicted only where guilt has been established beyond a reasonable doubt." (January 12, 2005 Habeas Petition No. 05CV0024, pg. 12.) Rolle further argues that "[t]he evidence that was proffered by the peoples witnesses was unreliable, not to be viewed as having any weight or credibility. There was no in-court identifications." Id. at 13.

Although Rolle's claims primarily are couched as "weight of the evidence" challenges,

because Rolle is *pro se* these claims may be construed as "insufficiency of the evidence" claims.

See Davis v. McLaughlin, 122 F. Supp. 2d 437, 441 (S.D.N.Y. 2000) (recognizing that

complaints of pro se petitioners are to be considered liberally in their favor and, therefore,

construing pro se petitioner's "weight of the evidence" claims as "insufficiency of the evidence"

claims), which *are* cognizable on habeas review. See Jackson v. Virginia, 443 U.S. 307, 324

(1979).

Rolle "bears a very heavy burden" when challenging the legal sufficiency of the evidence

in a state criminal conviction. Einaugler v. Supreme Court, 109 F.3d 836, 840 (2d Cir. 1997).

The relevant question for this court is whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A "federal

habeas court faced with a record of historical facts that supports conflicting inferences must

presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any

such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.

Additionally, this Court must defer to the jury's assessment of the credibility of witnesses.

Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996). Thus, habeas corpus relief is only warranted

when the record is "totally devoid of evidentiary support." Gonzalez v. Reiner, 177 F. Supp. 2d

211, 218 (S.D.N.Y. 2001).

Construing Rolle's claims liberally, the essence of those claims is that the government did

not prove beyond a reasonable doubt the elements of the crimes for which the jury convicted

him. When examining this type of claim, "a federal court must look to state law to determine the

33

elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). This Court, drawing all inferences and resolving all credibility issues in favor of the prosecution, finds that the evidence was more than sufficient to establish that the elements of each crime for which Rolle was convicted were proven beyond a reasonable doubt at trial.

Thus, the Appellate Division's determination that Rolle's conviction was based on legally sufficient evidence was not contrary to, or an unreasonable application of, clearly established federal law. The Appellate Division based its determination on a review of the trial record, consistent with the standard set by the Supreme Court, see Jackson v. Virginia, 443 U.S. 307 at 324, and concluded that the only reasonable inference that could have been drawn by the jury was that Rolle committed each crime for which he was convicted. As such, Rolle's Petition is denied.

**III. CONCLUSION**

For the reasons discussed above, Rolle's Petition for a writ of habeas corpus is DENIED. A certificate of appealability shall not issue. The Clerk of the Court is directed to close the case.

SO ORDERED.

Date: August 20, 2008
Brooklyn, New York

s/Nicholas G. Garaufis

Nicholas G. Garaufis
United States District Judge

34